COPELAND et al. v. STAPLES et al.

(Circuit Court, D. Connecticut.   July 21, 1911.)

No. 1,323.

TRUSTS (§ 48*)—CONVEYANCE IN TRUST—VACATION—FRAUD.

In a suit to cancel a conveyance of certain property by complainant to defendant as trustee, evidence *held* insufficient to warrant a finding that complainant had been induced to execute the same either by misrepresentation as to her powers reserved in the agreement to use the principal, to revoke the trust at her election, or as to her inability to divest her husband of his share in her estate by will.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 70; Dec. Dig. § 48.*]

In Equity.   Bill by Grace Fones Copeland and others against Frank T. Staples as trustee and others.   Decree for defendants.

Wm. Hepburn Russell, for complainants.
John S. Pullman, for respondents.

PLATT, District Judge.   This is a bill in equity praying for the cancellation of an agreement between the plaintiff Grace Fones Copeland and the defendant Frank T. Staples, as trustee, on the ground that, when the agreement was executed by the plaintiff, she acted under a mistake as to its effect, which mistake was caused by false representations of the other defendant, Fones, and his agents.   It is further alleged that the agreement was executed under duress, but nothing is offered to sustain that allegation, and it will therefore be passed without comment.

There are three particular points upon which it is alleged that false representations were made:

(1) As to Mrs. Copeland's inability to divest her husband of a share of her estate by will.

(2) As to her unlimited power to use the principal as she chose.

(3) As to her absolute power of revocation.

As to the first point, the testimony not only fails to sustain the allegation, but it shows that Mrs. Copeland was truthfully and properly advised that the only absolutely sure way to protect the property from her worthless husband, except by first divorcing him, was to execute the deed of trust.

As to the second point, the complaint charges that both defendants and Mr. Canfield, the attorney, falsely represented in August, 1908, that under the trust agreement Mrs. Copeland "could withdraw and use the principal of said securities which they represented to her she

was conveying in trust in such a way as to enable her to withdraw such principal as she desired the same."

The rights of the plaintiff with regard to the principal of the fund are set forth in section 5 of the trust agreement, which it is well to quote in full:

"(5) It is further agreed by and between the parties hereto that if at any time through illness of the party of the first part, or unusual emergencies that cannot now be foreseen, or for any cause not herein specified, it should be deemed necessary or expedient *by said Staples* to expend or appropriate for her benefit, or to transfer to her any part or the whole of the principal of said trust estate, *he* shall have the right to do so, first procuring the written authority, consent and request of the party of the first part." (Underscoring mine.)

The testimony shows that Mrs. Copeland's father from whom the estate came died in September, 1907. There was no attempt on the part of Fones or Canfield to hurry her into a decision about her share of the property. She had a child, the pet of its grandfather, and a bad husband, who was living in the South with another woman. Mr. Canfield suggested divorce, but that she did not wish. Mrs. Copeland united with her brother, Dr. Fones, and Mr. Canfield in the desire to protect her share of the estate absolutely in the interest of herself and her child from any future attack thereon by her husband. She was properly advised that this could not be safely done by will, as I have said above. The settlement of the estate progressed leisurely, and it was August, 1908, when the time had come for distribution. Mrs. Copeland and Dr. Fones were the only heirs and by mutual distribution the property set out to each was agreed upon. Mrs. Copeland was given her choice of the kind of property she should have, and she took income producing personal, rather than real, estate. The parties met at Mr. Canfield's office on August 13th and 14th to close the matter up. The trust agreement had been prepared by Mr. Canfield prior to the meeting of the 13th, and was read over carefully and distinctly, paragraph by paragraph, by Mr. Canfield, but was not thought sufficiently elastic by Mr. Staples, who had been selected as trustee, and an adjournment was had until the 14th for a revision of the terms of the agreement. On the 14th Mrs. Copeland, Dr. Fones, and Mr. Staples met with Mr. Canfield at his office. The mutual distribution was first disposed of, and then the trust agreement was taken up. It was again read over, paragraph by paragraph. Before signing, Mrs. Copeland said:

"I might want to build a house, buy an automobile, or buy a horse. In such case I might want to have access to the principal. Now can that be done?"

Mr. Canfield then read over again, aloud and carefully, section 5 of the agreement, and said to her, as he puts it:

"I thought the language in that article was broad enough to exhaust the entire estate, the principal and the income, if it was deemed necessary and expedient to do so."

Dr. Fones remembers that he said, "It is broad enough to cover this point." Mr. Staples remembers that "he stated that that could be

189 F.—17

done, provided the trustee thought it necessary." Mrs. Copeland testifies that in response to her remark he read the fifth paragraph over again, and said: "I think, Mrs. Copeland, that is broad enough to cover everything you may wish." Prior to March 5, 1909, differences had arisen between Mrs. Copeland and Mr. Staples, the trustee. She wanted a loan, and the trustee did not find good reason for making it. She thereupon brought the matter to a climax by her letter dated March 5, 1909. In that letter she stated that her memory was that Mr. Canfield "said that was broad enough to prove my rights to all the principal, if need be."

At the argument counsel for Mrs. Copeland announced his willingness to stake her case upon that letter. He insists that it shows that on March 5, 1909, she believed that she had placed her property in trust in such a way as to enable her to use the principal, and that she did it solely to protect the property from any claim her husband might have in case of her death. The letter shows, to my mind, that on March 5, 1909, she was undertaking to carry to the mind of the trustee the impression that such was her belief then, and that she signed the agreement with such a belief. The trouble with the case is that I am unable to believe her when she says so. She is an unusually intelligent woman. This whole case turns on whether under section 5 of the trust agreement Mrs. Copeland understood that she was to be the judge of whether at any time it was necessary to dip into the principal, and whether she was brought to that understanding by the false representations of Dr. Fones or Mr. Canfield. Mr. Staples is, I understand, exonerated by her counsel.

The language of paragraph 5 is so plain that it is impossible for Mrs. Copeland to have had the slightest doubt about what it meant. It is a matter of mystery how any lay person of either sex, and especially one with sufficient command of English to be worth the salary Mrs. Copeland was getting on the Philadelphia paper, can bring oneself to say that it was ambiguous and needed a lawyer to explain it. It is true that in referring to it Mr. Canfield did not discuss the point as to who should decide the question of necessity, but it would seem a waste of words to have done so with such positive language in the paragraph. After Mrs. Copeland spoke about an automobile as within the scope of her possible desires, it might have been wiser for Mr. Canfield to have told her that it was unlikely that such a thing as that would be regarded by the trustee as coming within the spirit of the section; but the trust ought not to be set aside because of Mr. Canfield's failure to cover every possibility of the future, and I am satisfied that nothing which he said or did or neglected to say or do at the August 14th meeting or at any other time, had the slightest influence upon Mrs. Copeland's mind when she signed the agreement. When Mrs. Copeland wrote the letter of March 5, 1909, the crucial point of the case was plain to her, because she apparently endeavored to call to the trustee's mind the section which she insists that Dr. Fones and Mr. Canfield misinterpreted to her. She says:

"Section 5 reads in toto 'through illness, unusual emergencies that cannot be foreseen, or for any cause not herein stated, it should be deemed necessary or expedient to transfer any part or the whole of said trust estate.'"

Section 5 must have been before her when she wrote that language, and a comparison will show that she deliberately omitted every word of the paragraph which demonstrates absolutely that the necessity or expediency of appropriating for her benefit, or transferring to her, any portion of the principal was to be settled by Mr. Staples, the trustee. She must have been possessed of about the same amount of sagacity in August, 1908, as in March, 1909. Any one foolhardy enough to attempt to mislead her on either occasion would have had his labor for his pains. The very object and purpose of the trust would have been defeated if the agreement had meant what she professes to say she thought it meant. Her husband had beguiled her before, and was evidently capable of doing so again. She was protecting herself and child from his attacks, and she deliberately took the only safe way to do so. The facts do not sustain the second point of the allegation.

There is no evidence to sustain the allegation on the third point as to false representations regarding her absolute power of revocation.

It all comes down to this: If she could have had her own way about the principal, or have revoked the trust whenever the whim to do so seized her, the act into which she entered on August 14, 1908, after nearly a year's deliberation, would have been as unstable as the shifting sands. Its solemnity would have been a mockery and a travesty, and the child would have been in constant danger of never enjoying the comfort which it was the fond hope of the grandfather to provide for. It is an abnormal situation that this same child should now be urged by its guardian to take a step, which, if it succeeded, would in all human probability put the trust fund forever beyond her reach.

Let the bill be dismissed, with costs.